# In the United States District Court
## for the
## Western District of Texas

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | SA-10-CR-222-XR |
| | § | |
| DAGOBERTO RODRIGUEZ-CASTORENA | § | |

## ORDER

On this day came on to be considered Defendant's motion to suppress (docket no. 16).

## Background

Dagoberto Rodriguez-Castorena (Rodriguez) is charged in an indictment with illegal re-entry into the United States in violation of 8 U.S.C. § 1326.

On February 16, 2010, a Ford Expedition was traveling north on IH 35. Border Patrol Agent Patrick Philpot was also traveling north on the interstate when he encountered the Expedition. The encounter occurred about 9:00 a.m., between mile markers 96 and 98, which is approximately 75 to 90 miles from the border (as measured from Eagle Pass, Texas).[1] Agent Philpot testified at the

---

[1] At the time Agent Philpot stopped the vehicle he did not know where the vehicle originated its journey. Typically, the Fifth Circuit has stated that "[v]ehicles traveling more than fifty miles from the border are usually a 'substantial' distance from the border." *See United States v. Orozco*, 191 F.3d 578 (5th Cir. 1999) ("a car traveling more than fifty miles from the border is usually viewed as being too far from the border to support an inference that it originated its journey there") (*quoting United States v. Jones*, 149 F.3d 364, 368 (5th Cir. 1998)).

suppression hearing that this area is a known corridor for drug smuggling and

the transportation of illegal aliens.

Agent Philpot was traveling in uniform and in a marked Border Patrol

vehicle.  He maneuvered his vehicle alongside the Expedition and noticed the

driver and passenger talking, joking, and the passenger had his feet on the dash

with no shoes on.  Agent Philpot testified that when the driver and passenger

noticed him, they stopped taking, the driver "stiffened up", they became "rigid",

and the passenger took his feet off the dash and crouched down as if reaching for

his shoes.

Prior to traveling alongside the Expedition, Agent Philpot did not notice

anything unusual about the vehicle, the Expedition had not committed any

traffic infractions, and he had no reason to stop the vehicle.[2]

After noticing the change in demeanor, Agent Philpot testified that he

maneuvered his vehicle behind the Expedition and ran the vehicle's license

plates into his computer database.  The Expedition was registered to an owner

that lived in Dallas, Texas.  No arrest warrants were noted.

Thereafter, Agent Philpot ran the license plates into a computer database

to determine whether the Expedition had crossed the border or passed through

---

[2] Agent Philpot testified that from the time he eyeballed the vehicle to the time he
pulled the vehicle over, he didn't notice "illegal activity as cut and dry, black and white.  I
really didn't see anything black and white."  He further testified that the only things that
aroused his suspicion were the driver and passenger's change in demeanor and their
communication stopped.  Finally, he testified that he had a suspicion there "was something
going on."  "In my opinion, from my observation, my experience, I believed that the vehicle
contained illegal aliens or contraband.  That's why I pulled it over."

"Charlie 29", the Border Patrol checkpoint located at IH 35 and mile marker 29. The computer database had no record of the Expedition crossing the border or passing through "Charlie 29" within the last 72 hours.

Based on the above, Agent Philpot activated his lights and attempted to stop the Expedition. Rather than immediately stopping, the driver drove a short distance to an area with shrubs. The driver thereafter stopped his vehicle and the driver and passenger fled the scene. Agent Philpot approached the vehicle and at that time noticed five individuals in the rear cargo area of the Expedition. The Defendant was one of the five individuals found in the vehicle. Agent Philpot detained the five individuals. They were later transported to another location, where they were interviewed and fingerprints were taken.

Defendant argues that the vehicle he was in was stopped with no reasonable suspicion. Defendant seeks suppression of any verbal statements he made and seeks suppression of any fingerprints taken at that time. In addition, Defendant argues that he was questioned by agents without first being read his Miranda rights.[3] Defendant also seeks suppression of his A-file.[4]

The Government argues that the Defendant has no standing to challenge the stop of the vehicle. Alternatively, the Government argues that Agent Philpot

---

[3] Defendant argues in his motion that his *Miranda* rights were only read to him after he was interviewed. The Government did not address this issue at the suppression hearing. The Government also did not address the issue in any of its briefing. In *U.S. v. Montalvo-Rangel*, Slip Copy, 2010 WL 1417745 (W.D. Tex. 2010), the Government conceded in that case that there is apparently a custom or practice that ICE agents interrogate individuals first and provide *Miranda* warnings afterward.

[4] Defendant concedes that this argument is foreclosed by Fifth Circuit precedent, but nevertheless has made the argument in order to preserve the issue for appeal. *See U.S. v. Pineda-Chinchilla*, 712 F. 2d 942 (5th Cir. 1983).

had reasonable suspicion to stop the Expedition. Lastly, the Government argues

that in any event, Defendant's fingerprints and the A-file are not subject to

suppression.

## Analysis

### A.    Standing argument

Rodriguez did not have a possessory or privacy interest in the vehicle.

Accordingly, he lacks standing to challenge the search of the vehicle. *See United*

*States v. Roberson*, 6 F.3d 1088, 1091 (5th Cir. 1993).   But in this case,

Defendant is not contesting any search of the vehicle.  When the vehicle was

stopped, the driver and passenger opened their doors and fled.  Agent Philpot

saw the Defendant and four other aliens in plain view.

Nevertheless, because the stop resulted in Rodriguez's seizure, he does

have standing to challenge the legality of the stop which caused the subsequent

seizure of his person.  *See Brendlin v. California*, 551 U.S. 249 (2007); *U.S. v.*

*Lara*, 271 Fed. Appx. 404 (5th Cir. 2008).   Accordingly, the Government's

argument that Defendant lacks standing is overruled.

### B.    Vehicle Stop

Because this case involves a roving Border Patrol stop, the Court applies

the principles enunciated by the Supreme Court in *United States v.*

*Brignoni-Ponce*, 422 U.S. 873 (1975).   Under *Brignoni-Ponce*, a temporary

investigative stop of a vehicle may be made by a roving patrol if the Border

Patrol agents are aware of "specific articulable facts, together with rational

inferences from those facts, that reasonably warrant suspicion" that the vehicle is involved in illegal activities. *Brignoni-Ponce*, 422 U.S. at 884.  The totality of the circumstances is to be considered by a court in assessing reasonable suspicion. *U.S. v. Lopez*, 911 F.2d 1006, 1009 (5th Cir. 1990).  Relevant factors include known characteristics of a particular area, previous experience of the arresting agents with criminal activity, proximity to the border, patterns of traffic, characteristics of the vehicle stopped, including its type and appearance, and finally the behavior of the driver of the vehicle. *Brignoni-Ponce*, 422 U.S. at 884-85.  Although any single factor taken alone may be insufficient, under a "totality of the circumstances" analysis, the absence of a particular factor will not control a court's conclusions. *Lopez*, 911 F.2d at 1009.

In this case the Government argues that the following factors justified the vehicle stop: (1) the change in demeanor by the driver and passenger; (2) the passenger stooped down to put his shoes on; (3) the vehicle was registered to someone who lived in Dallas; (4) the area was a known smuggling route; and (5) the vehicle did not pass through the "Charlie 29" checkpoint earlier in that morning.  The Government, citing *U.S. v. Arvizu*, 534 U.S. 266 (2002), argues that all these factors taken collectively support the agent's belief that the vehicle had likely begun its trip near Laredo, Texas, the five aliens walked around the Charlie 29 checkpoint, boarded the Expedition thereafter, and were then being taken to a major urban center (San Antonio or Dallas) where "stash houses" are located.

Relying upon *U.S. v. Rangel-Portillo*, 586 F. 3d 376 (5th Cir. 2009),
Defendant argues that any change in demeanor by the driver and passenger
should be afforded little weight.  Further, Defendant argues that the distance
from the border in this case weighs heavily against a finding of reasonable
suspicion.

In *Arvizu*, a Border Patrol agent was working at a border patrol
checkpoint approximately 30 miles north of the border city of Douglas, Arizona.
The agent received reports of sensor activity in the area.  One sensor report
indicated that a vehicle was heading westbound on Rucker Canyon Road.  The
agent travelled to the area and saw the dust trail of an approaching vehicle
about a half mile away.  The agent had not seen any other vehicles and, based
on the timing, believed that this was the one that had tripped the sensors.  The
vehicle was a minivan, a type of automobile that the agent knew smugglers used.
As it approached, it slowed dramatically, from about 50-55 to 25-30 miles per
hour.  The agent saw five occupants inside.  The driver appeared stiff and his
posture very rigid. He did not look at the agent and seemed to be trying to
pretend that the agent was not there. The agent thought this suspicious because
in his experience on patrol most persons look over and see what is going on, and
in that area most drivers give border patrol agents a friendly wave.  The agent
radioed for a registration check and learned that the minivan was registered to
an address in Douglas that was four blocks north of the border in an area
notorious for alien and narcotics smuggling. After receiving the information, the
agent decided to make a vehicle stop. The agent asked the driver if he could look

6

inside and search the vehicle. Arvizu agreed, and the agent discovered marijuana in a black duffel bag under the feet of two children in the back seat. Another bag containing marijuana was behind the rear seat. In all, the van contained 128.85 pounds of marijuana, worth an estimated $99,080. Arvizu was charged with possession with intent to distribute marijuana. He moved to suppress the marijuana, arguing among other things that the agent did not have reasonable suspicion to stop the vehicle as required by the Fourth Amendment. After holding a hearing where the agent and Arvizu testified, the District Court denied the motion to suppress. The District Court pointed to a number of the facts described above and noted particularly that any recreational areas north of Rucker Canyon would have been accessible from Douglas via 191 and another paved road, making it unnecessary to take a 40-to-50-mile trip on dirt roads. The Ninth Circuit reversed. The Supreme Court granted certiorari "because of its importance to the enforcement of federal drug and immigration laws."

The Supreme Court stated that because "the 'balance between the public interest and the individual's right to personal security,' *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), tilts in favor of a standard less than probable cause in such cases, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot.'" *Arvizu*, 534 U.S. at 273.

The Supreme Court further stated that a reviewing court should make reasonable-suspicion determinations looking at the "totality of the circumstances

of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *Id.* "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.* An officer's reliance on a mere " 'hunch' " is insufficient to justify a stop, but the "likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id.* at 274.

The Supreme Court held that the agent had reasonable suspicion to believe that Arvizu was engaged in illegal activity. "It was reasonable for Stoddard to infer from his observations, his registration check, and his experience as a border patrol agent that respondent had set out from Douglas along a little-traveled route used by smugglers to avoid the 191 checkpoint. Stoddard's knowledge further supported a commonsense inference that respondent intended to pass through the area at a time when officers would be leaving their backroads patrols to change shifts. The likelihood that respondent and his family were on a picnic outing was diminished by the fact that the minivan had turned away from the known recreational areas accessible to the east on Rucker Canyon Road. Corroborating this inference was the fact that recreational areas farther to the north would have been easier to reach by taking 191, as opposed to the 40-to-50-mile trip on unpaved and primitive roads. The children's elevated knees suggested the existence of concealed cargo in the

passenger compartment. Finally, for the reasons we have given, Stoddard's assessment of respondent's reactions upon seeing him and the children's mechanical-like waving, which continued for a full four to five minutes, were entitled to some weight." *Id.* at 277.

In *Rangel-Portillo*, the Fifth Circuit concluded that the detention of Rangel-Portillo's vehicle lacked reasonable suspicion even though the stop occurred a mere 500 yards from the border.  The Fifth Circuit concluded that reasonable suspicion could not be concluded from the fact that all of the passengers in the vehicle wore seatbelts, sat rigidly, refrained from talking to one another, and had no shopping bags as they exited a Wal-Mart parking lot. In addition, the Fifth Circuit rejected the Government's request to defer to the agent's expertise in recognizing these factors as reasonably suspicious behavior.

Other recent Fifth Circuit opinions have reached a different result.  In *U.S. v. Serrano-Villalobos*, 326 Fed. Appx. 274 (5th Cir. 2009), the Fifth Circuit concluded that the fact that the agent observed the vehicle exiting from a ranch that borders the Rio Grande "contributes significantly" to the reasonableness of the agent's suspicion." Id. at *1.  Further, the agent testified that the ranch was located in a "high traffic" area, that numerous seizures of aliens and narcotics had occurred in this area, and that he had made arrests in that particular area. The Court concluded that these factors weighed in favor of reasonable suspicion. The agent also testified that he had seen only the ranch owner on the property, and he did not recognize this particular vehicle or its occupants.

In *U.S. v. Hernandez-Moya*, 353 Fed. Appx. 930 (5th Cir. 2009), the Fifth

Circuit concluded that the fact that a border patrol agent initially observed six

Hispanic occupants in a Tahoe near Midland, Texas and after running a

computer check on the vehicle observed that the Tahoe now appeared to only

contain two individuals-the driver and the front passenger, allowed the agent to

infer that the four passengers in the back had ducked down to hide.

Viewing the evidence in this case in its totality, Agent Philpot had only a

"hunch" that illegal immigrants would be found in the vehicle.  He testified that

he did not see anyone in the rear cargo area and he did not notice whether the

vehicle was "riding low."  He saw a change in demeanor in the driver and

passenger.  That factor is entitled to little weight.  The fact that the area was a

known smuggling route does favor the Government's position.  But it should be

noted that the stop occurred at 9:00 a.m. on a well-traveled interstate highway,

not a rural or secluded road in the dead of the night.  The stop occurred well

outside the immediate border area.  The fact that the passenger took his feet off

the dash and reached for his shoes is not indicative of criminal behavior.

Otherwise, the remaining points articulated by the Government were grounds

developed by the agent after he stopped the vehicle.  Prior to activating his

lights, Agent Philpot had no reason to suspect that the vehicle started out that

morning in Laredo and circumvented the checkpoint.  Indeed, it is just as

plausible that the vehicle could have traveled along various state highways and

never originated in Laredo, Texas or ever came upon the checkpoint.

Reviewing the facts in their totality, the Court concludes that there was

10

no reasonable basis for this stop.

C.     Fingerprints

"Under the fruit of the poisonous tree doctrine, all evidence derived from the exploitation of an illegal search or seizure must be suppressed, unless the government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the constitutional violation." *United States v. Dortch*, 199 F.3d 193, 200-01 (5th Cir. 1999).

The Government, relying upon *U.S. v. Olivares-Rangel*[5],and *U.S. v. Ortiz-Hernandez*[6], argues that since the Defendant's fingerprints were only taken as part of the regular "booking" process, the fingerprints should not be subject to suppression.  This Court in *U.S. v. Hernandez-Reyes*, 501 F. Supp.2d 852 (W.D. Tex. 2007)(J. Martinez) adopted the position in *Olivares-Rangel* concluding that if an illegal arrest is used as an investigatory device to obtain fingerprints, the fingerprints are then regarded as inadmissible fruit of an illegal detention. However, if fingerprints are taken as part of a routine booking procedure following an arrest (that later is determined to be illegal), such fingerprints will not be poisoned fruit of an illegal arrest and should not be suppressed.  *Id.* at 861.

In this case, the Defendant does not argue that his arrest was an investigatory device to obtain his fingerprints.  The Fifth Circuit has not

---

[5] 458 F.3d 1104 (10th Cir. 2006)

[6] 427 F.3d 567 (9th Cir. 2005).

squarely addressed this issue.  *See U.S. v. Lopez-Pocazo*, 84 Fed. Appx. 366 (5th Cir. 2003) ("This court has not decided whether fingerprint evidence is suppressible in a prosecution pursuant to 8 U.S.C. § 1326."). However, the Fifth Circuit has held that "neither a defendant's identity or his Immigration and Naturalization Service ("INS") file are suppressible, and this is true even if such evidence is obtained through exploitation of an illegal detention."  Id. at *1.

This Court concludes that since the Defendant's fingerprints were only taken as part of the regular "booking" process, the fingerprints should not be subject to suppression.

## Conclusion

Defendant's motion to suppress is granted in part and denied in part.  Any verbal statements Defendant made are suppressed because of the lack of reasonable suspicion to stop the vehicle and because Defendant was not administered his Miranda warnings.  Defendant's fingerprints taken after the stop and his A-file are not subject to suppression.

It is so ORDERED.

SIGNED this 26th day of April, 2010.

_____

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE